UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION No. _____

RICHARD P. McCLURE,
MARTHA McCLURE,
PLAINTIFFS

V.

**04   10826   RGS**

WILLIAM F. GALVIN;
SECRETARY OF THE
COMMONWEALTH OF MASSACHUSETTS,

ELIZABETH L. DELANEY, TOWN CLERK FOR THE
TOWN OF CHELMSFORD, MASSACHUSETTS, and

JANE DOE, CHELMSFORD ELECTION BALLOT CLERK


PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF COMPLAINT FOR
DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF


ISSUES:


I. Whether Mass. Gen. L. Ch. 53, Sec.'s 6 and 37's ninety day party enrollment restriction places an unconstitutional burden on the voting and associational rights of the independent candidate and his supporters

II. Whether The 1993 emergency amendment to Mass. Gen. L. ch 53, Sec. 37, which removed the *notice or knowledge* of party enrollment previously extended to the unenrolled voter when voting in a March presidential primary election, and the resultant vote itself, constitute a knowing, intelligent and voluntary waiver of a voter's constitutional right to

-2-

seek a place on the November ballot as a candidate for a district senate seat.

III.  Whether the the actions of the defendants, Secretary of State, William Galvin, Chelmsford Town Clerk; Elizabeth L. Delaney, and Jane Doe, Chelmsford election poll clerk, as well as the 1993 Massachusetts legislature, in their totality, unconstitutionally and invidiously discriminate against the plaintiff, his supporters, and all unenrolled voters, by failing to properly inform them that voting in the presidential primary in March will elim-inate their abilities to have their name placed on the November ballot as a candidate for a district senate seat.

ARGUMENT: ISSUE I

Mass. Gen. L. Ch. 53, Sec.'s 6 and 37's ninety day party enrollment restriction  place an unconstitutional burden on the voting and associational rights of the independent candi-date and his supporters.  Plaintiffs allege that said statutes are a violation of their First and Fourteenth Amendment rights, Sec's 1973(c) and 1983 of Chapter 42 of the U.S. Code, as well as their rights as set forth under Aricle IX of the Declaration of Rights of the Consti-tution of the Commonwealth of Massachusetts.  In denying the plaintiff/candidate his right to vote in a presidential primary *and* appear as a candidate on the November, state elect-ion ballot, the defendants, without the demonstration of a compelling state interest, deny the other plaintiffs their First and Fourteenth Amendment rights to freedom of association for the purposes of the common advancement of political beliefs and ideas.

-3-

The United States Supreme Court has consistently held that a citizen's right to vote is protected under the First and Fourteenth Amendments to the United States Consitituion from either federal or state action. "No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live." *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964). "The right of suffrage is a fundamental matter in a free and democratic society. Especially since the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights, any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized." *Reynolds v. Sims*, 377 U.S. 533, 561-562 (1964). The political franchise of voting is a fundamental political right, because preservative of all rights." *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886). "[W]e must reject the notion that Art. II, Sec. 1 gives the states power to impose burdens on the right to vote, where such burdens are expressly prohibited in other constitutional provisions." *Williams v. Rhodes*, 393 U.S. 23, 29.

The United States Supreme Court has also consistently held that a citizen's right to associate with others for the common advancement of political beliefs and ideas is protected under the First and Fourteenth Amendments to the United States Constitution from either federal or state action. "[F]reedom to associate with others for the common advancement of political beliefs and ideas is a form of 'orderly group activity' protected by the First and Fourteenth Amendments. *NAACP v. Button*, 371 U.S. 415, 430, *Bates v. Little Rock*, 361 U.S. 516, 522-523, *NAACP v. Alabama*, 357 U.S. 449, 460-461. "The

-4-

right to associate with the political party of one's choice is an integral part of this basic constitutional freedom." *Williams. v. Rhodes*, supra at 30, *Kusper v. Pontikes*, 414 U.S. 51, 56-57.

Mass. Gen. L. ch. 53, Sec. 37 forces the plaintiff, Richard P. McClure, an unenrolled voter, to choose (either knowingly or unknowingly; described in detail in Argument II) between exercising his constitutional right to vote in a state's presidential primary or his constitutional right to access to the November ballot as a candidate for election to the state senate. The effect of said Mass. Gen. L. ch. 53, Sec. 37, eliminating the plaintiff as a candidate for election to state office, deprives the plaintiffs, Martha McClure and those similarly situated, of their constitutional rights of freedom of association by denying them the ability to vote for their candidate of choice. "...the primary values protected by the First Amendment 'a profound national commitment to the principle that debate on on public issues should be uninhibitied, robust, and wide-open,' *New York Times v. Sullivan*, 376 U.S. 254, 270, are served when election campaigns are not monopolized by the existing political parties." *Anderson v. Celebrezze*, infra, at 561.

Plaintiffs' challenges to the constitutionality of said Mass. Gen. L. ch. 53, Sec's 6 and 37 as infringements on their rights guaranteed under the First and Fourteenth Amendments to the United States Constitution and, therefore, violations their of civil rights under 42 U.S.C. Sec. 1983, and are entitled to review by a federal court. The question; however, is to what standard of review and what level of scrutiny will the Court apply.

-5-

This difficult analysis is set forth quite well in the Court's 1983 decision, *Anderson v.*

*Celebrezze*, 460 U.S. 780, 789

> "Constitutional challenges to specific provisions of a State's election laws ...
> cannot be resolved by any 'litmus-paper test' that will separate valid from
> invalid restrictions. *Storer, supra*, 415 U.S., at 730. Instead, a court must
> resolve such a challenge by an analytical process that parallels its work in
> ordinary litigation. It must first consider *the character and magnitude of the
> asserted injury* to the rights protected by the First and Fourteenth Amend-
> ments that the plaintiff seeks to vindicate. It must then identify and evaluate
> the *precise intersts* put forward by the State as *justifications for the burden
> imposed* by its rule. In passing judgment, the Court must not only determine
> the *legitimacy and strength* of each of those interests; it also must consider the
> *extent to which those interests make it necessary to burden the plaintiff's rights.*
> Only after weighing all these factors is the reviewing court in a position to de-
> cide whether the challenged provision is unconstitutional" (emphasis added).

and repeated again in its 1997 decision, *Timmons, Acting Director, Ramsey County*

*Department of Property Records and Revenue v. Twin Cities Area New Party.*     ,

> "While the First Amendment protects the rights of citizens to associate and
> to form political parties for the advancement of common goals and ideas,
> *Colorado Republican Federal Campaign Comm. v. Federal Elections Comm.*,
> 518 U.S. __, __, states may enact reasonable regulations of parties, elections
> and ballots to reduce election and campaign related disorder, *Burdick v. Tak-
> ushi*, 504 U.S. 428, 433...Regulations imposing severe burdens must be nar
> rowly tailored and advance a compelling state interest. Lesser burdens, how-
> ever, trigger less exacting review, and a State's important regulatory interests
> will usually be enough to justify reasonable, nondiscriminatory restrictions.
> Ibid....No brite line separates permissable election related regulation from un-
> constitutional infringements on First Amendment freedoms." *Storer v. Brown,*
> 415 U.S. 724, 730.

Against this analytical backdrop, the facts of the case at hand must be applied. The first

consideration is the "character and magnitude"of the plaintiffs' asserted injuries to those

rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindi-

cate. Plaintiff, Richard P. McClure, asserts that he has constitutionally protected right to participate in his state's primary election for president of the United States, "Where a primary election is provided for by statute, the right to vote and have that vote counted fairly and properly is entitled to scrupulous protection." *United States v. Classic*, 313 U.S. 299, 316-317. "The same tests regarding either discrimination or the transgression upon any constitutional right apply equally to primary and general elections." *Smith v. Allwright*, 321 U.S. 649, 654 (1944).

Plaintiff, Richard P. McClure, also asserts, under the First and Fourteenth Amendments to the United States Constitution, as well as Art. IX of the Massachusetts Constitution, constitutionally protected rights to have equal access to the November ballot for election to the position of state senator in the third Middlesex district of Massachusetts. Said M.G.L. ch. 53, Sec. 37 places an unconstitutional chill on plaintiff's right to vote in the presidential primary

The plaintiff, Martha McClure and those similarly situated, assert that their First Amendment rights to freedom of association, their Fourteenth Amendment rights to equal protection and the rights guaranteed by Art. IX of the Massachusetts Constitution have been effectively denied by the state's refusal to allow the plaintiff, Richard P. McClure, equal access to the November ballot as a candidate for state senator. "The right to freedom of association protects the rights of individuals to associate together in the formation of new political parties for the purpose of advancing ideas and beliefs, and parties and

-7-

their candidates are entitled to places on the ballot, subject only to reasonable restrictions

or requirements imposed by the states. Interference with the freedom of a political party is

simultaneously an interference with the freedom of its adherants; the right to run for public

office touches upon the freedom of association and falls within the protections of the First

Amendment. See *Anderson v. Celebrezze, supra*.

To deny the plaintiffs, individually or as a group, any of these constitutionally protected

rights certainly serves as an injury of great character and magnitude. Consider now the

fact that of the Commonwealth's 3.9 million registered voters, 50% are registered as un-

enrolled (no designated party affiliation) and the potential ramifications are enormous.

Should some 2 million unenrolled Massachusetts voters be denied their constitutional right

to vote in a presidential primary election in March if they are considering a run for state

office in November? Having chosen to vote in said presidential primary, should some 2

million unenrolled voters be denied their constitutional rights to run for state office and to

have equal ballot access in November? Should some 2 million unenrolled voters be denied

their constitutionally guaranteed rights of freedom of association by having their candi-

date(s) of choice (theoretically 2 million choices) denied access to the November ballot in

a state election? There should be no question that Mass. Gen. L. ch. 53, Sec.s 6 and 37

not only impose a consitutional injury of great character and magnitude upon the plaintiff/

candidate, Richard P. McClure; however, it also subjects some 2 million unenrolled voters

to the very real possibility of the same injury and should certainly qualify the statute as one

-8-

which unfairly burdens the availability of political opportunity so as to subject it to some

form of enhanced scrutiny.

The second determination which needs to be made under the *Anderson v. Celebrezze*

analysis is the identification and evaluation of the precise interests put forward by the state

as justifications for the burden imposed by its rule. The decision in the Massachusetts case

on point, *Metros v. Secretary of the Commonwealth*, 396 Mass. 156, (1985), has been re-

ferred to by Massachusetts courts as being dispositive of plainiffs' claims in at least one

known, similar cases filed since the *Metros* decision. See *Lafrazia v.* William F. Galvin,

Secretary of the Commonwealth et al, Essex Superior Court No. 00-1036, attached hereto

as Exhibit G.

In *Metros*, the Massachusetts Supreme Judicial Court relies almost entirely on the

*Storer v. Brown*, 415 U.S. 724 (1974), decision and the constitutionality of the state's

interests and justifications for a one year disaffiliaiton period for potential candidates set

forth therein.

> "It (the *Storer* Court) found that the state's interests in the stability of its political
> system were compelling. Those interests outweighed the interests of the indepen-
> dent candidate in choosing not to disaffiliate from the party until less than twelve
> months before the primary election. *Id* at 736... The statute furthered the stability
> of the political system by limiting ballot access to those who have qualified through
> either the partisan or non-partisan route, and by preventing candidacies prompted
> by short range political goals, pique, or personal quarrel. *Id* at 735."

*Storer* can be distinguished from the case at hand in that, in *Metros*, the Massachusetts

Supreme Judicial Court failed to make the very important distinction that *the plaintiffs in*

*the Storer matter were running for the United States Congress, the Vice-Presidency and the Presidency of the United States* and the California statute at issue revolved around their ballot access thereto.

In the case at hand, as well as in Metros, the plaintiff/candidates were seeking election to a district office, one of forty such districts that make up the state senate. Plaintiffs were not candidates for statewide or national office. Furthermore, Mass. Gen. L. ch 53, Sec. 37 has no effect in the other three years (non-presidential party primaries) but discriminates against the plaintiffs in that they chose to run for state office during a presidential election year. Mass. Gen. L. ch. 53, Sec.37 places no such burden on the Democratic or Republican candidates; such candidates being able to vote in the March primary without any disqualification from the November ballot and therefore discriminates against the state's 2 million unenrolled voters.

The final step under the *Anderson* analysis, "...In passing judgment, the Court must not only determine the legitimacy and strength of each of those [state's] interests; it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights. The Court's holding in *Metros* clearly states that the alleged infringement on the plaintiffs' constitutional rights is justified by the compelling state interest "...in furthering the stability of the political system by limiting ballot access to those who have qualified through either the partisan or nonpartisan route, and by preventing 'candidacies prompted by short range political goals, pique, or personal quarrel.'" Id at 735.

-10-

Mass. Gen. L. ch. 53, Sec. 37 forces an unenrolled voter to choose between exercising his constitutional right to vote in a presidential primary or having his name appear on the November ballot as an unenrolled candidate for a state district office under the guise of a compelling state interest which allegedly preserves political and elective stability. What compelling state interest in maintaining party and elective stability is possibly served when, under the authority and encouragment of a state statute, Mass. Gen. L. ch. 53, Sec. 38, unenrolled primary voters can participate in one of the major party's presidential primaries by literally enrolling and unenrolling in said party within a matter of minutes?

A political party's First Amendment rights of association well understood and notwithstanding; however, when without requiring any form of committment or party allegiance whatsoever, a major political party allows 2 million unenrolled voters to waltz in and out of its primary in a matter of minutes, cast a secret ballot, and leave the polls in the same unenrolled status as when they entered, it must be argued that both the party, and the state, have just effectively waived any claims of association rights otherwise sustainable as a compelling state interest which denies the same two million unenrolled voters their constitutional rights to ballot access and freedom of association. Suprisingly, even the Metros Court noted "...While we discuss Metros' claim in terms of a closed primary, we note that in Massachusetts the provisions of G.L. c. 53, Sec.'s 37 and 38 'blur any meaningful distinction between open and closed primaries." quoting *Langone v. Secretary of the Commonwealth*, 388 Mass. 185.

-11-

The Massachusetts presidential primary, for all intents and purposes, is nothing more than a glorified public opinion poll and has absolutely nothing to do with party affiliation, party allegiance or the preservation of party or election stability and under no circumstances should it be allowed to be utilized as a compelling state interest which denies two million unenrolled voters (50% of the registered voters in the Commonwealth) their constitutionally protected rights to vote, gain access to the ballot and associate freely in the pursuit of a district office senate seat.

Ironically, this permitted and encouraged Massachusetts primary election procedure is exactly the situation feared under the interparty raiding theory which the courts have consistently upheld as destabilizing the primary process and producing the potential for election chaos. In *Storer*, the justices equate the holding in *Rosario v. Rockefeller*, 410 U.S. 752, (1973), with their own. "We sustained the provision as "in no sense invidious or arbitrary," because it was tied to the particularized legitimate purpose," id. at 762, of preventing interparty raiding, a matter which bore on the "integrity of the electoral process." Id at 761.

Rather, by having the potential of enrolling some two million, unenrolled voters in its primary, albeit for only one day, the prevailing party candidate is able to assert a claim of having received the majority of that state's popular vote and be rewarded with a majority of that state's delegates at the national convention. This dual benefit allows the eventual party nominee of not only being the most likely party candidate to be elected by the state's entire voting population in November, but also provides the party with bragging and mar-

-12-

keting rights in other states as to the candidate's popularity.

The net effect and presumed purpose of Mass. Gen. L. ch. 53, Sec.'s 6 and 37 is to require all candidates who wish to appear on the November ballot to have declared their party status at the start of a 90 day window and any potential candidate who changes their party status within the 90 day window shall be declared ineligible to run for that new party status on the November ballot. Therefore it would be impossible for any candidate to attempt to switch parties *after* the start of the 90 day window and gain access to the November ballot as another party's candidate..

i.e. A registered republican could not switch his/her party status to either unenrolled or democrat after the start of the 90 day window and appear as a unenrolled or democratic candidate on the November ballot.

i.e. A registered democrat could not switch his/her party status to either republican or unenrolled after the start of the 90 day period and appear as a republican or unenrolled candidate on the november ballot.

i.e. Nor could an unenrolled voter switch his/her party status to either republican or democrat after the start of the 90 day window and appear as either party's candidate on the November ballot.

It is therefore immaterial, under Sec. 37, whether the potential candidate switches parties on the *90th day* or the *last day* prior to submitting signatures for certification; it is the establishment of party enrollment at the start of the 90 day window which is controlling and serves the alleged purpose and compelling state interests of maintaining political stability, preventing interparty raiding and sore loser activity as set forth in *Storer* and *Metros*. No candidate, of any party or unenrolled, already having established his candidacy for the November ballot before the start of the 90 day window, should be denied his

-13-

right to exercise his right to vote in the presidential primary. "If the state has open to it a less drastic way of satisfying its legitimate interests, it may not choose a legislative scheme that broadly stifles the exercise of fundamental personal liberties." *Shelton v. Tucker*, 346 U.S. 479, 488.

It should also be noted that the Massachusetts presidential primary in March contains no *state office* primary contests and, therefore, sore loser, personal quarrel, pique, etc. activity should not even be at issue. In addition, under Sec. 6 and the Secretary's Candidates Guide, at page 12, for the candidates running for *federal* office, the start of the 90 day window commences *on the same day* as the presidential primary; however, for some unexplained reason, for state district candidates, the 90 day window commences one week before the presidential primary. Why not simply make them both start on the day of the presidential primary as this only extends the period of time by one week; still some six months before the general electon. Clearly a less burdensome opportunity to maintain a ninety day window *and* permit unenrolled voters to participate in the presidential primary.

In conclusion, the character and magnitude of the loss or compromise of voting, ballot access and associational rights of some 2 million unenrolled voters (50% of the state's registered voters) are at issue. The precise interests put forward by the State as justifications for this burden are alleged to be the stability of its political system. The legitimacy and strength of this interest has been refuted by the plaintiffs' demonstration of how irrelevant party allegiance/enrollment actually is in the Massachusetts presidential primary . Finally, the state's alleged interest in burdening some 2 million unenrolled voters' constitu-

-14-

tional rights could easily be remedied by less burdensome means.

### ARGUMENT: ISSUE II

The 1993 emergency amendment to Mass. Gen. L. ch 53, Sec. 37, which removed the *notice or knowledge* of party enrollment previously extended to the unenrolled voter when voting in a March presidential primary election, and the resultant vote itself, cannot possibly constitute a knowing, intelligent and voluntary waiver of the unenrolled voter's constitutional right to seek a place on the on the November ballot for a district senate seat.

In 1993, the state legislature amended said M.G. L. ch. 53, sec. 37 as follows:

Historical and Statutory Notes

**1993 Legislation**

St. 1993, c. 475, Sec. 26, an emergency act, approved Jan. 14, 1994, in the first paragraph, in the third sentence, substituted "enrollment" for "enrolment" and "the ballot clerk shall ask such voter in which political party's primary he desires to vote" for "he shall ask be asked by the ballot clerk with which political party he desires to be enrolled", in the fourth sentence, substituted "the ballot of the political party so requested" for one ballot of the political party in which he is thus enrolled", and added the fifth sentence.

Mass. Gen. L. ch. 53, Sec.36, as amended, requires an unenrolled voter wishing to vote in a party's presidential primary to answer the question "...in which political party's primary he desires to vote," *the answer to which, by statute, automatically and without notice enrolls him/her in that party.* The net result of said 1993 amendment being *the removal of the notice or knowledge of party enrollment* afforded to the unenrolled voter prior to said amendment. "There exists grave risks in legislation, enacted by incumbents

of the major political parties, which distinctly disadvantages minor parties or independent candidates." *Bachrach v. Secretary of the Commonwealth*, 382 Mass. 256, quoting *Buckley v. Valeo*, 424 U.S. 1, 251 (1976). "But in exercising their powers of super-vision over elections and in setting qualifications for voters, the States may not infringe upon basic constitutional protections. See *Dunn v. Blumenstein*, 405 U.S. 330, *Kramer v. Union School District*, 395 U.S. 621, and *Carrington v. Rash*, 380 U.S. 89.

Mass. Gen L. Ch. 53, Sec. 38 allows a voter of any party affiliation or unenrolled voter to cast a party ballot in the presidential primary, and then, via a signed certificate, unenroll from said party in a matter of minutes. Said Sec. 38 offers a suggested "change of enrollment status" certificate to be used by town clerk as follows:

"...At presidential primaries the city or town clerk shall make available within the polling place *certificates to enable a voter to change his party or political designation en-rollment, which shall be in substantially the following form* (emphasis added):

Name................................................................................
                    (print)

Address................................................................................
I hereby request that my political party or political designation enrollment be changed as follows:

From:................................................................................
                    (Name of party or political designation or Unenrolled)

To:................................................................................
                    (Name of party or political designation or Unenrolled)

Signed under the pains and penalties of perjury.

................................................................................
                    (Signature)

-15-

The town of Chelmsford form offered to voters as alleged compliance with said Mass.

Gen. L. ch. 53, Sec. 38 contains no such "change party to/from" language, rather it states

"I hereby request that my enrollment be *established* (emphasis added) as **U** and is given to

the unenrolled voter at the same time he/she requests a party ballot.


Plaintiff, Richard P. McClure, in his Affidavit, states:

5.  On March 2, 2004 I visited Precinct #1 in the town of Chelmsford for the purpose of
voting in the presidential primary, approached the ballot clerk and gave my name and
address. The clerk opened the registration log to the page of my name and address, verb-
ally confirmed that I was Richard P. McClure and asked in which party primary would I
like to vote. I asked for a democratic ballot.

6.  I then observed the clerk to make a large "D" next to my name. I informed the clerk
that I did not want to enroll in the Democratic party, that I was running as an independent
candidate on the November 04 ballot, and needed to maintain my independent status. The
clerk then informed me that I was not enrolling in the democratic party, that the "D" next
to my name was for the purpose of recording which ballot I had requested and then pro-
ceeded to hand me a certificate which indicated that I was establishing my voter status as
"unenrolled." as proof that I was keeping my unenrolled status. See Exhibit C and plain-
tiff's affidavit


The language of the proposed change of voter status certificate set forth in Sec. 38 at

least, at a minimum, gives the voter some indication or warning that his/her voter status is

changing and needs to be changed back. However, the voter status certificate offered by

the Town of Chelmsford town clerk, the defendant, Elizabeth L. Delaney, contains no

such change party to/from languae, rather it is given to the voter at the time of requesting

a party ballot and simply states the voter is "establishing his party enrollment as **"U"**

(unenrolled) thereby giving the voter the impression that his/her party enrollment will

remain unenrolled and has not changed by asking for a party primary ballot.

-16-

As stated in the plaintiff's affidavit, erroneous information was given to the voter by the ballot clerk at the time of check in regarding party enrollment. When questioned by the plaintiff after having been notified of his disqualification, even the defendant, town clerk Elizabeth L. Delaney, stated that she was unaware of this law (see plaintiff's affidavit). When questioned as to why would the ballot clerk give erroneous information, the defendant, town clerk Elizabeth L. Delaney, stated that her clerks should not be responsible for "the intricacies of Massachusetts election law" See plaintiff's affidavit and *Lowell Sun* article; Exhibit E. Indeed, under Sec. 37, this impression is reinforced in that during the other three years (non-presidential party primaries) the act of asking for a party primary ballot by an unenrolled voter has no effect on his/her unenrolled voter status. Mass. Gen. L. ch. 53, Sec. 37, *as amended in 1993*, has been shown to be a surreptiously contrived waiver of constitutional rights.

### ARGUMENT: ISSUE III

The the actions of the defendants, Secretary of State, William Galvin, Chelmsford Town Clerk; Elizabeth L. Delaney, and Jane Doe, Chelmsford election poll clerk, as well as the 1993 Massachusetts legislature, in their totality, unconstitutionally discriminate against the plaintiffs', and all unenrolled voters, by failing to properly inform them that voting in the presidential primary in March will eliminate their ability to have their name placed on the November ballot as an unenrolled candidate for a state district office. "The court must focus on the degree to which the challenged restrictions operate as a mechanism to exclude certain classes of candidates from the electoral process. The inquiry is whether the challenged restriction unnecessarily burdens the availability of political

-17-

opportunity." *Anderson v. Celebrezze, supra*, quoting *Clements v. Flashing*, 457 U.S. 957.

   In addition to simple logic set forth supra, one must consider the factual and statutory issues which indicate that M.G.L. ch. 53, Sec. 37, as amended, operates as a mechanism which purposely, and without a valid state interest, seeks to reduce the number of unenrolled voters who might seek state office in November. "A citizen has a constitutionally protected right to participate in elections on an equal basis with all other citizens. It is thus essential that the requisite qualifications for either ballot placement or voter participation do not create a class against which the laws invidiously discriminate. The right to vote is extended to all qualified citizens, and subject to limited requirements, must be freely and equally exercised." *Dunn v. Blumstein*, supra, at 336.

What was the emergency that prompted the 1994 emergency amendment to Sec. 37 removing the *knowledge or notice* language that the unenrolled primary voter had just joined one of the two majority parties simply by requesting a primary ballot?

How was it that the Secretary of State has been named as a defendant in this type of election law litigation for more than twenty years yet no warning is referenced in the candidates rule book provided by said Secretary of State?

How was it that the party enrollment standards of Sec. 37 had somehow become a mysterious "intricacy" of election law unknown to the defendant, town Clerk, or her poll workers prior to the March 2004 email from the Secretary's office. See *Lowell Sun* Article dated March 27, 2004.

Why is it that the defendant, town clerk, did not receive information or concern regarding unenrolled voter rights from the Secretary of State prior to the presidential primary, yet immediately after the 2000 and 2004 primaries emails were sent out from his office warning town clerks to be on the lookout for independent candidates who voted in the recent presidential primaries as their independent status could no longer be validated under Sec.'s 6 and 37?

-19-

Clearly the actions of the legislature and the defendant, Secretary of the Commonwealth, William F. Galvin, indicate invidious discrimination. Sec. 6 is nothing more than a screening method used to eliminate independent candidates from the ballot as a result of having voted in the presidential primary and has been effective for some twenty plus years. The defendant, Secretary of the Commonwealth, and the Legislature, purposely fail to inform unenrolled voteres, via statute and by candidate's guide book, of the potential loss of constitutionally guaranteed rights by voting in said presidential primary. "Protecting the Republican and Democratic parties from external competition cannot justify the virtual exclusion of other political aspirants from the political arena." *Anderson v. Celebrezze,* supra, quoting *Williams v. Rhodes,* supra, at 23, 31-32.

For all of the above reasons, plaintiffs' complaint for declaratory judgment and injunctive relief should be granted

Dated:    April 26, 2004

for the plaintiffs,
Richard P. McClure,
Martha McClure, and
those similarly situated unenrolled Massachusetts voters

Richard P. McClure, Esquire
8 Westford Street
Chelmsford, MA 01824
(978) 256-8822
BBO#564713